256 So.2d 321 (1971)
TRAVELERS INDEMNITY COMPANY, Plaintiff-Appellee,
v.
SEARS, ROEBUCK & COMPANY, Defendant-Appellant.
Alexie J. PLAISANCE, Jr., Plaintiff-Appellee,
v.
SEARS, ROEBUCK & COMPANY, Defendant-Appellant.
Nos. 8663, 8664.
Court of Appeal of Louisiana, First Circuit.
December 20, 1971.
*322 William A. Porteous, III, Porteous, Toledano, Hainkel & Johnson, and Larry Boudreaux, New Orleans, for defendant-appellant.
*323 Francis Dugas, Thibodaux, for plaintiffs-appellees.
Before LOTTINGER, SARTAIN and ELLIS, JJ.
SARTAIN, Judge.
These consolidated cases arise out of a fire on July 23, 1968, in the home of plaintiff, Alexie J. Plaisance, Jr., in Golden Meadow, Lafourche Parish, Louisiana. The fire began when a pan of grease overheated and ignited on the kitchen stove which had been sold to plaintiff and serviced by defendant Sears, Roebuck & Company (Sears). Plaintiff, Travelers Indemnity Company (Travelers) was Mr. Plaisance's fire insurer and seeks to recover from Sears the amount which it paid under its policy (No. 8664). Plaintiff, Plaisance, seeks to recover his alleged losses in excess of the insurance coverage (No. 8663). Also named as defendants were the George D. Roper Corporation, alleged to have been the manufatcurer of the allegedly defective stove, and its insurer, Interstate Fire and Casualty Company; however, the action by each plaintiff against these defendants was dismissed by the trial court's judgment and there was no appeal from these dismissals.
The trial judge awarded judgment in favor of Travelers and against Sears in the amount of $70,525.00 and in favor of Mr. Plaisance and against Sears in the amount of $14,275.00. Sears has appealed contending that the trial judge erred in finding negligence on the part of Sears, in failing to find negligence on the part of Mrs. Plaisance (who was using the stove when the fire started) and in awarding damages which were not supported by the record. Neither plaintiff has appealed nor answered the appeal by Sears and, although it is argued on behalf of Mr. Plaisance that the damages found by the trial judge were inadequate, that issue is not before us. We affirm the judgments of the trial court in each of these consolidated cases.
The Plaisance family moved into their new house in January of 1968 or about six months prior to the fire which gave rise to these suits. Their kitchen plans had been designed and furnished by Sears and Sears had sold them a Kenmore brand electric range, which was advertised as having an Automatic Surface Unit or, as it was referred to during the trial, a "burner with a brain".
The advertising brochure represented that this unit would hold the pan and food at a set temperature, just as a preheated oven holds a selected temperature. The brochure indicated that there are at least two important components in the unit: a sensor element which measures the temperature of the bottom of the pan on the burner and a control element which activates or deactivates the coils of the burner according to the temperature setting.
It appears that the "burner with a brain" never worked properly for the Plaisances, in that it would overheat and not cut off at the selected temperature. On one occasion it melted a teapot which had been left on the heating coils. Thereafter, the Plaisances would not use this burner and for several months tried unsuccessfully to have Sears send a service man to repair it. On the evening of the fire, July 23, 1968, at about 6:45 p. m., a Sears service man, a Mr. Valure, did go to the Plaisance home to fix this particular burner as well as the oven, which was also causing some trouble.
Mr. Valure testified that he first inspected the sensor element and found it to be defective. He replaced it with a new part. He ran a test with some water in a small container at a temperature setting of 220 degrees and said that the water boiled and the burner cut off automatically. Once the burner cut off, he turned the stove controls to the "Off" position, waited a minute or so and repeated the test with the same results. He then turned his attention to the oven, fixed it in about ten minutes and had finished his work at about 7:15 p. m. Mrs. Plaisance was not in the kitchen while Mr. *324 Valure was working, but as he was leaving he indicated to her that the burner was functioning properly.
As soon as he left, Mrs. Plaisance put about two inches of fresh Crisco cooking oil in a cast iron pot and attemped to french fry some small quartered potatoes at a temperature setting of 350 degrees. Some minutes later she noticed that the potatoes were charred so she cut off the burner, removed the potatoes and by slicing them discovered that they were still raw on the inside. She left the burner off for five to ten minutes to allow the grease to cool. Then she turned it back on at a temperature setting of 250 degrees and began to salt and pepper some pork chops. After about thirty seconds she simultaneously noticed that the grease was smoking and heard a call from one of her children that a baby's diaper needed attention. She turned the temperature control to "Low" and left the kitchen. Within fifteen seconds, she heard a child exclaim that there was a fire in the kitchen. She attempted to put out the fire by throwing first flour and then water on the stove and did succeed in extinguishing the fire in the stove area. However, the flames had already been drawn by the vent fan into the duct which led to the attic. When she realized this, she immediately got her children out of the house and called the fire department from a neighbor's home.
It is not disputed that the fire was caused by the overheated grease or that the overheating was caused by a defective component part in the "burner with a brain" unit. But it appears from the testimony of the experts who examined the stove after the fire that the sensor element put in by Mr. Valure was still good; however, the control element, referred to as the "King-Seeley relay", was defective, so that it would not deactivate the burner when the selected temperature was reached.
Plaintiffs contend that Sears may be found liable, first, for selling a defective stove and, second, through the negligence of its service man, for failing to discover and repair all defects in the burner after the complaint had been made. They contend further that Mrs. Plaisance was free from negligence and was entitled to rely upon the representations of Mr. Valure that the burner was functioning properly.
Defendant contends that Sears was merely a retailer of a stove manufactured by a third party and cannot be held liable for a hidden defect of which it had no actual knowledge. It is contended that when Mr. Valure replaced the defective sensor element and tested the unit twice with satisfactory results he was not negligent in failing to investigate further for a defect in the control element or King-Seeley relay. Sears further contends that Mrs. Plaisance was negligent in continuing to use the "burner with a brain" after charring the potatoes at a temperature setting of 350 degrees, noticing the grease smoking later at a temperature setting of 250 degrees and leaving the kitchen under these circumstances with the burner activated, even though she turned the control to the "Low" position.
We agree with the plaintiffs' contentions on all points. The recent case of Penn v. Inferno Manufacturing Corporation, 199 So.2d 210 (1st La.App.1967); writ refused, 251 La. 27, 202 So.2d 649 (1967), in our opinion provides a comprehensive analysis of the liability of a seller who has sold as his own a product in fact manufactured by another, at 199 So.2d 214-215.
We quoted a portion of the opinion in Carney v. Sears, Roebuck & Co., 309 F.2d 300 (4 Cir., 1962) which we deem equally important here:
"`The undisputed evidence in the record shows that the defendant was not the manufacturer of the ladder. The ladder was manufactured by the J. R. Clark Company of Minnesota, but the name of the manufacturer does not appear at any place on the ladder and the defendant's name appears on the label attached to the ladder. There was no indication either about the merchandise *325 or in the newspaper that any-one other than the defendant had anything to do with this product.' Supra, at 302.
In reasoning that Sears be held responsible, the Court cited with approval the following language from the Restatement of the Law of Torts, Vol. 2, Sec. 400, comment c.
"One who puts out as his own product chattels made by others is under a duty to exercise care, proportionate to the danger involved in the use of the chattels if improperly made, to secure the adoption of a proper formula or plan and the use of safe materials and to inspect the chattel when made. But he does not escape liability by so doing. By putting a chattel out as his own product, he causes it to be used in reliance upon his care in making it. Therefore, he is liable if, because of some negligence in its fabrication or through lack of proper inspection during the process of manufacture, the article is in a dangerous defective condition which the vendor could not discover after it was delivered to him.' * * *
The Court commented further on the basis of its ruling as follows:
"The basis of the rule is that where the vendor puts only its name upon the product without indicating that it is actually the product of another then the public is induced by its reasonable belief that it is the product of the vendor to rely upon the skill of the vendor and not upon the skill of any other.'"
The stove in the instant case was a Kenmore, a trade name used by Sears, and there was no indication that it was in fact manufactured by someone else. The Plaisances dealt only with Sears and relied upon the advice and services of its agents, both in the original purchase and in the subsequent repair calls. We find that Sears is subject to the same liability as the manufacturer of the stove for damages caused by defects even in the absence of actual knowledge thereof.
Even if this were not so, we do not think that Mr. Valure exercised reasonable care in ascertaining whether the "burner with a brain" was operating properly. In particular, we compare the recommended demonstration described in the advertising and instruction brochure with the tests he said he performed.
The pertinent part of the brochure reads as follows:
"TO GAIN CONFIDENCE
"Consistent cooking action can be demonstrated with water. Measure 2 cups of water into an uncovered, 3 quart aluminum sauce pan. Place pan on the unit and set knob to 225. Watch water come to a light boil and wait 5 minutes to assure yourself the water action remains the same. Then turn control to 300 and repeat. The water action at 300 will be a rapid boil." (Emphasis ours.)
Mr. Valure described his tests as follows:
"A. I placed about three-quarters of an inch of water in a small container, and I put it on the unit, and turned it on, set the dial for 220°, within a matter of a minute or less it came to a rather violent boil, and the element had glowed red and cut off.
* * * * * *
"... Once it cut off, I did touch the controls. I turned the control to the off position.
"Q. But that was after it had stopped glowing red, and begun to grow dark?
"A. Yes, sir. I turned it, after approximately about a minute or minute and a halfI gave the water a chance to kind of cool. I turned it back on again, and set it for 220°, and let it reheat, and it did cut off again."
It is clear that Mr. Valure did not use the procedure described in the brochure, and *326 even the results of his test at 220°, "a rather violent boil", should have indicated to him that the control was still not functioning properly. That result was more consistent with a temperature setting of 300 degrees, and there was ample expert testimony that the unit should have had a variation of only 5 degrees or 10 degrees, plus or minus, from the temperature setting. He knew or should have known that the "burner with a brain" was dependent for proper operation upon more than one component part and, faced with evidence of a temperature variation which was not within tolerable limits, he was under a duty to investigate further. His failure to do so constituted negligence in his attempt to repair the burner and that negligence is imputable to his employer, Sears.
The alleged contributory negligence of Mrs. Plaisance consists of the fact that she continued to use the burner after charring her potatoes, an occurrence which, it is urged, should have put her on notice that the temperature control was not working. As noted above, she cut off the burner for five or ten minutes to allow the grease to cool and discarded the potatoes. When she turned it on again, she set the temperature control at 250 degrees for about thirty seconds and as she left the kitchen to tend to her baby she cut the control to "Low". A few seconds later the fire started. We are not persuaded that Mrs. Plaisance should have realized that such an extreme hazard as a "run-away" burner existed. At most, she was aware that the burner had overheated at a setting of 350 degrees, but since it had been on for several minutes under the potatoes and no fire had occurred, she was not aware of the degree of possible overheating and her reduction of the controls to the "Low" position cannot be considered an unreasonable attempt to use a burner which, in her mind, had just been repaired.
We further agree with the trial judge's finding of fact that Mrs. Plaisance's action in throwing flour on the fire was not improper emergency action. Although the defendant argued that flour is combustible, the expert testimony on plaintiff's behalf showed that it was only combustible in an extremely fine dust and that, although other materials might have been better, any dry solid including flour could be used to extinguish a grease fire.
With respect to quantum, it appears that the Plaisances' home was a total loss. Although there was expert testimony to the effect that some of the outside and foundation structure and materials might have been salvageable, it was clear that it would not have been economically wise to do so. The cost of labor in effecting the salvage would have exceeded the value of the structure and materials salvaged. Mr. Plaisance testified that he had spent nearly $60,000.00 in repairing the house, including the cost of clearing debris which he placed at $4,500.00. However, the trial judge used the figure $49,800.00, the amount of a bid by a building contractor, as the basis of damages attributable to the dwelling. Although defendant contends that the amount is excessive, it was the lowest figure presented to the court and even then it did not include the cost of clearing away the debris. It was described as a "from the ground up" bid. We find that the award for this item of damages was not excessive.
The other items of damages were the household contents and clothing which were categorized and valued separately by the Plaisances at figures of $43,032.50 for contents and furnishings, with no specified allowance for depreciation, and $15,583.99 for the clothing of the Plaisances and their seven children, with a fifteen percent allowance for depreciation.
The trial judge, after stating that the contents and clothing were certainly well above average and most of the contents were relatively new, arrived at a lump sum figure of $35,000.00. The record amply supports the findings that most of the contents and furnishings were bought for the new house and were less than six months *327 old. In addition, a great deal of the clothing, particularly that of the seven children, was relatively new. In our opinion, the total valuation placed on these items by the trial judge was, if anything, conservative. It certainly does not appear that the Plaisances have failed to show a loss on these items of at least $35,000.00.
For the above and foregoing reasons, the judgment of the trial court is affirmed, at defendant-appellant's costs.
Affirmed.